And we'll move to our fifth case this morning, United States v. Brian Cook. Mr. Frederick. May it please the court. I'm Terry Frederick. I'm from the Federal Public Defender's Office in the Central District of Illinois. Appearing on behalf of the appellant, Brian Cook. Your Honors, brandishing a weapon as a guideline enhancement was meant to exist. And like its more serious counterpart, other use of a dangerous weapon, it was meant to encompass a range of conduct. Now, the upper limit of other use of a dangerous weapon has always been very well defined. It's discharge of a weapon. Similarly, the lower limit of brandishing has also always been very well defined. It is essentially gesturing at a lump in your clothing and suggesting that there's a weapon secreted there. Somewhere in the middle, those two comprise a spectrum. And somewhere in the middle is a line. Whereby on one side of that line, it's brandishing and on the other side of the line, it is other use of a weapon. That line has never been very well defined by this court or so far as I can tell any other court in the country. This is the perfect case to draw that line definitively. Because the threat of harm visited upon the tellers in this case by Brian Cook wasn't personalized in any sense of the word. You are being robbed. Those are the only four words Mr. Cook was quoted as saying when he entered the Citizens National Bank in Roseville. No one said he had an elevated tone of voice. No one said he was forceful. No one said he was screaming. I'd submit that he was calm, that he said those words almost robotically. From eight to ten feet away, he pointed a BB gun, pistol, at one teller and then the other for seconds each, directed them to fill his bag with money, and he made off after one to two minutes. So when a person points a gun at you and you don't know whether it's a BB gun or not, how is that threat not personalized? You're the only one in the room or the only one in the area. We're about 10 to 12 feet apart, right? Sure. If someone's standing there with a pointed gun at me, I would think that threat is very personalized. Specific leveling of a firearm has been adopted as a criteria for other use of a firearm in the Ninth and First Circuits. I believe the government probably advocates for this circuit to adopt that standard, but this circuit rejected that standard in, I believe, the Kruger case. And it adopted a more holistic standard, which I think is more appropriate. And that includes conduct such as pointing that gun directly at someone's head, pointing it at a specific body part, accompanying the pointing of the weapon with a threat, ordering someone to the ground. These are all prodding someone with a firearm or a facsimile firearm. Either of those things, any of those things, all of those things have been held to comprise other conduct. They're sufficient, but not necessary. This court has repeatedly held that there's no definitive, that any combination of things can be otherwise used. But brandishing includes display of a firearm to intimidate someone. And from 8 to 10 feet away, this is probably near the upper limit of the brandishing spectrum, but it should encompass a range. And because there was nothing personalized about this case, this is a perfect case to draw that upper line of the brandishing range. Why wouldn't the statement from your client, you are being robbed, at the same time he's pointing the gun, why doesn't that cross the line and amount to a specific threat of harm? I would analogize it to another case where it was held to be other use, where the person, the robber, there was other conduct as well, but said, I don't want to hurt you. That was meant, that carried an implicit threat of harm, that if you don't comply, I'm going to hurt you. You are being robbed. It's such a mechanical statement. It is such a non-emotionally charged statement. He isn't just saying that, he's pointing the gun at them at the same time. For mere seconds. It was a BB gun from 8 to 10 feet away and for mere seconds he did. You're the teller. Not saying that tellers wouldn't feel, but we base our enhancements and our criminal sentences, for that matter, on the conduct and the intent of the defendant in criminal cases. Generally in the United States, more than, we don't take eggshell plaintiffs in criminal law and aggravate sentences on that behalf. And that takes me to one of the procedural errors that the district court applied in this case, which is the district court invented a guideline enhancement out of whole cloth, which is a small town bank enhancement. Clearly one of the factors that she relied heavily upon in aggravating, in nearly doubling Mr. Cook's sentence, was the fact that he had committed this offense in a small town. That is very problematic, Your Honors, because if you uphold that basis as a justification for aggravating a sentence, what you're saying to tellers who work in large towns, in big cities, we're not going to protect you as much as people in a rural area. You are assuming... No, it's clear that judges may depart from the guidelines and have a philosophy at variance with policies within the guidelines, of course. But when they depart drastically in their sentence from the guideline range, as the district court did in this case, that warrants searching review. And there are, other than the guideline error, there's the invented guideline, which is the small town bank enhancement. That wasn't a guidelines error. It wasn't a guidelines enhancement. That was a factor that the judge used as an aggravating consideration in deciding to issue an above guidelines sentence. It had no effect on the guidelines range. I wasn't asserting that it was an actual guidelines enhancement, Your Honor. I was saying that, effectively, it became a guidelines enhancement because the district court in this case essentially disregarded Mr. Cook's argument that four of his criminal history points were marginal at best. Two of them don't count as of today, as a matter of fact. We have a new manual that came out today in the two status points that he was... She didn't disregard it. She just didn't put the weight on it that you did. Well, if she offset his criminal history by any amount for it, then it's amazing how far over she went over in the guideline table because she jumped from category four to category six as it was, and then down in offense level as well in order to reach the guideline range that she imposed of 12 years in this case. As we stand here today, Brian Cook would be category three because he's had a Missouri pot conviction expunged, and he also wouldn't have those two status points. So she sentenced him as though he was category six, and then she added an offense level beyond the ones that were already calculated in the guideline range. Your Honors, I will reserve the rest of my time for rebuttal. That's fine. Thank you. Mr. Simpson, welcome back. Thank you, Your Honors. May it please the court. I'm Scott Simpson on behalf of the United States. Your Honors, the guideline enhancement in this case was thoroughly justified, and the overall sentence was substantively reasonable and well explained. First on the enhancement, the defendant, of course, can get the lower brandishing enhancement just by giving the tellers a peek at his weapon, saying, look, I've got a gun, or just by saying, I have a gun, you don't even have to show your gun. The defendant doesn't even have to show his weapon to the victim to get that brandishing enhancement. But Mr. Cook did a whole lot more than that in this case, and actually take issue with some of the factual statements that defense counsel has made here. All we need to look, all we need to do is look at the three pictures in the government's brief here. In all three pictures, Mr. Cook was leveling his weapon at shoulder height with a stiff arm and pointing it at each of the employees. He pointed the weapon at the first teller and said, you are being robbed, and he kept pointing his weapon directly at her with that same stiff-armed position as he walked toward her. You can see in the picture on page six of our brief, he's pointing the weapon toward the teller's head very clearly. She's standing behind a counter, looks like a fairly high counter, as you sometimes see in a bank. And apparently all that Mr. Cook could see of this first teller was her head and upper body. Is just pointing the gun sufficient for the enhancement or does it have to be something else with it? Your Honor, certainly in this case, otherwise using is justified. It's hard to tell. Based on the just pointing at the gun or something else? Your Honor, if you look only at the guidelines, the guidelines say, again, brandishing can be just saying I have a gun. We're not here arguing this, but one could argue that pointing in addition to having a gun could support otherwise using. But here we have a whole lot more than that. If you look at the video as well, in addition to those three pictures, there's a video among the sentencing exhibits. If you look at the video, you can see that Mr. Cook comes in. He's holding that weapon up with that stiff-armed posture, pointing it at that first teller. You can see in the video he's walking toward that teller while he's continuing to hold out his gun with that same stiff arm posture as he walks toward the teller until the weapon. You can't see the teller herself in the video, but based on Mr. Cook's approach nearness to the counter in front of the teller, looks like that gun got to maybe about three or four feet from the teller again from the teller's head. Then he pointed his weapon at the other teller and said, stay where you are, are words to that effect. There's at least an implied threat in those words. Stay where you are, and I'm pointing a gun at you. You're basically implying stay where you are or I'll shoot you. So the four-level enhancement here was clearly justified. Even if it weren't actually justified, the district court said that those circumstances would justify the same sentence under the section 3553A factors. So now if I could move to the overall reasonableness of the sentence and the court's explanation. There were several aggravating factors that the court talked about, several aggravating factors in Mr. Cook's offense and several aggravating factors in his criminal history that the district court also referred to. He pointed his weapon directly at two tellers, as we talked about. He studied the bank and bank robberies in general in some detail very carefully. He apparently chose this bank because of it being in a very small town. That's very striking. He chose this bank for some reason. In the 2020 census, Roseville, Illinois had a population of only about 1,000 people, a very tiny place. So he obviously targeted that bank for some reason. And as the district court said, Mr. Cook probably figured that there would be less security at a very small town bank like that. Also, in relation to the scope of the offense, I'm not sure we referred to this before. He came away with a large amount of cash, almost $200,000. That's a huge haul compared to a lot of bank robberies these days. Mr. Cook also tries to downplay his criminal history. But let's look at it. According to the PSR, if you look particularly at paragraphs 36 through 44 of the PSR, looks like he was in custody for burglary, theft, stealing, forgery, and similar crimes pretty much continuously. Some periods of being out on parole, but pretty much continuously from 1982 to 2007. The courts say that he's been in and out of jail since the age of 18, I think. She said words to that effect, in and out of prison his entire life with theft offenses, exactly, something along those lines. The forgery offense that I just mentioned involved a government check for $19,000, pretty large government check. Mr. Cook committed several of those crimes while he was on parole or probation, and his parole or probation was revoked a number of times. He had at least two fugitive warrants against him at various times, and he had at least one actual conviction for escape. Mr. Cook's last term of parole on all those crimes, and I'm talking about the ones where he was in prison pretty much continuously from 82 to 2007. His last term of parole on those crimes ended in 2010, so it could be about 11 years before this bank robbery. Then in 2010, he was convicted of another crime of burglary and stealing, and he got a – unfortunately, he got a seven-year prison sentence, but it was – all of that was suspended, pretty much a slap on the wrist. And he completed probation in that case in 2014, so it's that – about seven years before this bank robbery. And in 2020, he committed two more crimes of stealing, only got fines in those two cases, and then in 2021, he commits this bank robbery. In light of all that history, I think the district court was certainly justified in saying – she actually said it twice at sentencing – that Mr. Cook was at an extreme risk to recidivate. As the district court said, this bank robbery was the defendant's 13th crime offense involving burglary, stealing, theft, forgery, and so forth. The district court explained all of that at length in sentencing Mr. Cook, so I think there's no question that she explained the sentence thoroughly. At some point, Your Honors, I think this is what we're seeing here. At some point, the criminal justice system just has to say, that's enough. I think that's what happened here with the sentence. The sentence was thoroughly warranted, and the district court thoroughly explained it. There's certainly no basis here for showing that the sentence for bank robbery was an abuse of discretion, so we urge the court to affirm. Thank you. Thank you. Mr. Frederick. Your Honor, the government comes here today with a couple of assessments that were never stated or really established at the district court level. That being that the government says that he pointed, in fact, a gun at one of the teller's heads three to four feet away and said, stay where you are. None of those statements were ever mentioned in the transcript. Three to four feet away was never – I guess that's the government's view of the video. When he looked at it himself, none of that was really established. The district court's reliance on criminal history was – yes, Mr. Cook had a long criminal history, but it was viewed a bit skewed, in my view, at the district court level. Thirteen offenses, but eight of those offenses were from the 80s, from the Reagan era, when Mr. Cook was 18 and 19 years old. He had actually lived in the community for about 12 years prior to commission of this offense with that one theft of food from a Walmart in 2020. I don't – and that's, I suppose, counted among those 13. So I think that criminal history is somewhat overstated in this case. This is not harmless error. None of this is harmless error in this case. The district court attempted to inoculate their sentence against remand by making a statement that I think I would give the same sentence if – even if I'm wrong in the guidelines and more or less resting her sentence on the 3553A factors. This court disfavors attempts to inoculate sentences like that because if you regularly upheld such inoculations, the guidelines would cease to have any meaning at all. They were meant to have meaning. But does it make a difference here where the court did more than just say that? The court added why under the 3553A factors she would do the same. So it wasn't a throwaway, oh, I would get the same sentence. It was under 3553A because of your criminal history, because of the nature of what happened there, because of your escalated history, I would give the same sentence. That seems different. Presumptively, if there's a guideline error under, I think, Gall and Marks, it usually goes back to the circuit court. In cases where it hasn't gone back or it's been harmless error are usually cases where the district court imposed a sentence below the guideline range. In one case, it was multiple life sentences. In cases where it was clear that there was not going to be any difference in the sentence. I see my time is up, Your Honors. Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.